## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |
|---|---|
| PREVENT U.S.A. CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>VOLKSWAGEN, AG; and VOLKSWAGEN<br>GROUP OF AMERICA, INC.,<br><br>    Defendants. | Case No.    2:22 cv 506<br><br><br>**JURY TRIAL REQUESTED** |

## FIRST AMENDED COMPLAINT

Plaintiff Prevent U.S.A. Corporation ("Prevent USA" or "Plaintiff") files this Complaint under the antitrust laws of the United States and the state laws of Texas against Volkswagen AG, and Volkswagen Group of America, Inc. (collectively "Volkswagen" or "Defendants") and alleges the following:

## NATURE OF ACTION

1.     This is a case about anticompetitive and tortious tactics used by Volkswagen, one of the largest carmakers in the world, to maintain its stranglehold over suppliers of Volkswagen automotive component parts. Volkswagen's business model depends on it maintaining market power over its suppliers and keeping its lower tier suppliers small and weak. This allows Volkswagen to impose abusive conditions on its suppliers, forcing them to operate at razor-thin margins or even at a loss. This results in sub-optimal output and lower quality goods among Volkswagen's suppliers, and in the long run, higher prices and reduced quality for the ultimate consumers.

2.     The Prevent Group—a group of affiliated international automotive component part suppliers—stood up to Volkswagen and presented a direct challenge to its business model. It did so through a strategy to acquire smaller, distressed suppliers, which provided Prevent Group with sufficient bargaining power to push back against Volkswagen's strong-arm tactics, and thereby created a procompetitive check on Volkswagen's market power. In response, Volkswagen undertook an

anticompetitive campaign to wholly exclude Prevent Group from the market. *First*, Volkswagen both refused to purchase from Prevent Group and orchestrated a boycott among other downstream suppliers to not purchase from Prevent Group. *Second*, once Prevent Group was excluded from the market, Volkswagen ensured Prevent Group would not be able to re-enter it by procuring agreements with its suppliers to not sell themselves to Prevent Group.

3.     This strategy was carried out with the purpose and effect of suppressing competition, maintaining Volkswagen's market power over its suppliers, and in the process causing massive losses to Prevent Group, including losses to Prevent Group's affiliate, Prevent USA, and harm to consumers. Prevent USA brings this action to put a stop to Volkswagen's conduct and to recover for such damage.

4.     The world of carmaker-supplier relations is notoriously rife with opportunities for abuse.  Like most major carmakers, Volkswagen buys parts for its vehicles from a network of suppliers across the world.  Volkswagen's profits depend in large part on keeping its lower tier suppliers small, fragmented, and often on the brink of insolvency.  Because of the high cost of switching between different car manufacturers, substantial capital expenditures, and limited information, these smaller suppliers cannot substitute their sales to Volkswagen with other car manufacturers, and instead must "comply or die" when faced with Volkswagen's anticompetitive terms and prices. Volkswagen works carefully to maintain this

dynamic and acts quickly to stop any supplier from amassing the scale and bargaining power that might threaten Volkswagen's market dominance.

5.     The Prevent Group began in the 1990s as a small, family-owned supplier of leather trim and seating components for automobiles.  By the 2010s, the Prevent Group had grown to be a significant supplier of Volkswagen automotive component parts, including through acquisitions of smaller, distressed suppliers that lacked the liquidity to keep operating in the face of Volkswagen's aggressive terms and prices.

6.     As it grew larger and acquired smaller, struggling suppliers, the Prevent Group amassed the size and bargaining power to resist Volkswagen's market dominance and insist on competitive terms and prices.  This undermined Volkswagen's dominance over suppliers:  If a supplier like Prevent Group were to grow big enough to resist Volkswagen, it would be able to insist on better terms and prices, and other suppliers might follow suit.  Volkswagen realized it needed to stop procompetitive consolidation in its tracks by excluding Prevent Group from the market, and then foiling any attempt to re-enter by blocking any acquisitions of suppliers by Prevent Group. This in turn would send a message to the rest of the automotive supplier industry.

7.     This all came to a head in the midst of Volkswagen's infamous "Dieselgate" scandal, in which Volkswagen deliberately manipulated emission

testing for its so-called "clean diesel" vehicles.  Rocked by scandal, and facing billions of dollars in fines and penalties, Volkswagen was desperate to maintain its market dominance over suppliers and stop the growing, procompetitive forces asserted by the Prevent Group.

8.      Volkswagen resorted to a series of illegal tactics to exclude Prevent Group from the market. At the highest levels of the company, Volkswagen executed an organized, institutional response with a single goal: identify and arrest any M&A activity among lower tier suppliers that would threaten Volkswagen's market power. Due to its recent growth through the acquisition of failing suppliers, the Prevent Group was at the heart of this strategy.

9.      Referred to internally as "Project 1," Volkswagen developed a highly organized campaign to "demolish"—as Volkswagen put it—the Prevent Group and systematically exclude the Prevent Group and its subsidiaries from the market. Project 1 was developed and led at the highest levels of Volkswagen leadership.

10.    Project 1 had several dimensions, including interfering with acquisitions by Prevent Group companies that might threaten Volkswagen's market power, hiring private investigators to spy on Prevent Group executives to gain insight into the Prevent Group's acquisition strategy and business, and manufacturing negative press about the Prevent Group.

11.    The details of these agreements came to light when a member of the

Project 1 team at Volkswagen decided to go public with what the company had done. In July of 2020, the press outlet Business Insider began reporting on the inner-workings of the Project 1 group at Volkswagen, sourcing its reporting from interviews with an internal member of the Project 1 team.[1] The reporting was sourced from over fifty hours of audio recordings of more than thirty Project 1 meetings from 2017 and 2018, which had been shared with Business Insider.

12.   Citing the Project 1 audio recordings, Business Insider reported on early 2017 meetings within the Project 1 group discussing how to redirect Prevent Group's business to other suppliers.[2]

13.   After the public reporting, the pieces of Volkswagen's conspiracy finally came together. Volkswagen's Project 1 strategy of "demolishing" Prevent Group was twofold.

---

[1] *See* Exhibit 1, Philip Kaleta et al., *A Bitter Feud Between VW, the World's Largest Car Manufacturer, and a Supplier Culminated in a Wild Scandal, with 50 Hours of Secret Talks Leaked, A 'Spy-Hunt,' and An Apparent Suicide*, BUSINESS INSIDER (Oct. 8, 2020), available at https://www.businessinsider.com/scandal-putin-kremlin-germany-former-chancellor-prosecutors-audio-leak-volkswagen-2020-7 (originally printed in English language); *see also* Exhibit 2, Philip Kaleta et al., *VW Tapes: In the Power Struggle with Prevent, Volkswagen Tried to Obtain Pre-emptive Rights or an "Information Obligation" From 217 Suppliers*, BUSINESS INSIDER (Oct. 4, 2020) available at https://www.businessinsider.de/wirtschaft/mobility/verstiess-vw-im-kampf-mit-dem-zulieferer-prevent-gegen-us-recht/ (originally printed in German language, unofficial English translation also available at hyperlink).

[2] *See* Exhibit 3, Jan C. Wehmeyer & Kayan Özgenc, *Turning Point in VW Wiretapping Affair: After the Suicide of A Suspect, The Public Prosecutor's Office Is Now Investigating a Top Manager in Russia*, BUSINESS INSIDER (Nov. 23, 2020), available at https://www.businessinsider.de/wirtschaft/wende-in-der-vw-abhoeraffaere-nach-dem-selbstmord-eines-verdaechtigen-ermittelt-die-staatsanwaltschaft-nun-gegen-eine-top-managerin-in-russland/ (originally printed in German language, unofficial English translation also available at hyperlink).

14.    First, Volkswagen would exclude Prevent Group from the market by refusing to directly purchase from it. Then, Volkswagen would also enlist "tier 1" suppliers of Volkswagen automotive component parts (who purchased from Prevent Group) to boycott Prevent Group from all business. In exchange, Volkswagen would award business directly to those "tier 1" suppliers with preferential terms and prices, outside the typical competitive bidding processes. Many of these suppliers agreed to boycott Prevent Group or its affiliates, refusing to purchase automobile component parts for Volkswagen vehicles made by Prevent Group. The effect of these exclusionary agreements was to starve Prevent Group and its affiliates, including Prevent USA, from the relevant market.

15.    Second, Volkswagen would threaten its other suppliers, and force them to agree to not be acquired by Prevent Group, thus prohibiting Prevent Group from re-entering the market or obtaining sufficient bargaining power to limit Volkswagen's abuse. Volkswagen did this in several ways, including by (i) making misleading statements to the acquisition targets' shareholders to induce the shareholders to reject Prevent Group's offers; (ii) soliciting and securing alternative offers or buyers; (iii) contacting the acquisition targets' other large customers to convince those customers to oppose the transaction; (iv) directly lobbying shareholders and other directors to vote against or otherwise block a proposed transaction; and (v) entering option agreements under which Volkswagen could purchase the company in the

event of an acquisition it did not like.  Volkswagen even hired private investigators to investigate more than two dozen Prevent Group executives, in an effort to gather more information about Prevent Group's potential takeover targets.

16.     The strategy behind Project 1 was based on the threat that Prevent Group posed to Volkswagen's market power.  An internal Volkswagen presentation observed that Prevent Group was "***continuing to actively exert pressure on Volkswagen through further takeovers!***"  According to the company's internal presentations, Prevent Group's acquisitions of weak suppliers created "increased risk potential" for Volkswagen, including "***negative purchase prices***."

17.     The internal presentations also outlined Volkswagen's response: Volkswagen would begin "scouring the supplier portfolio" for additional "small to mid-size suppliers with high dependency potential," try "to get visibility on potential sales," and then "***[i]nfluence consequently the M&A activities of global players***." In other words, Volkswagen would prey on weak suppliers—those with "high dependency" on Volkswagen—and use its power to stop them from being acquired by Prevent Group or its affiliates, including Prevent USA.  Volkswagen's internal Project 1 presentations, along with a comprehensive tracking spreadsheet that Volkswagen used to monitor M&A activity among suppliers, identified a number of U.S.-based suppliers as "increased risk" acquisition targets, including International Automotive Components Group Gmbh, with several U.S. locations, including

Arlington, Texas.

18.    Exerting its market power, Volkswagen extracted agreements from suppliers promising Volkswagen that they would not sell themselves or their assets to any company in the Prevent Group—effectively blocking Prevent Group and Prevent USA from the market for Volkswagen automotive component parts.

19.    Volkswagen's anticompetitive efforts have continued for years.  In 2016 through 2018, Volkswagen blocked Prevent USA's affiliate's attempts to acquire Grammer AG ("Grammer") and its U.S. subsidiaries.  Volkswagen agreed with Grammer management to block the Prevent USA affiliate's acquisition by threatening to stop doing business with Grammer.  Grammer management agreed to make a statement to shareholders condemning the deal, to stop communicating with Prevent Group, and to seek permission from Volkswagen before accepting any offer.

20.    In 2016 through 2017, Prevent Group sought to acquire Inter Groclin Auto ("Groclin"), a Polish supplier of automotive seat covers, car seats, and other automotive upholstery.  Volkswagen quickly intervened.  On May 4, 2017, Volkswagen forced Groclin to execute an option contract requiring Groclin to notify Volkswagen of any potential sale, including the identity of the potential acquirer, and to give Volkswagen the right to purchase Groclin instead of the other acquirer. Prevent Group's subsequent attempts to purchase Groclin were turned down. Upon information and belief, Groclin backed out of its negotiations with Prevent due to

Volkswagen's commercial and legal pressures.

21.    In 2021, TBP d.d. ("TBP"), a Volkswagen automotive parts manufacturer in Slovenia, sought to repurchase Prevent Group's shares. At the time, Prevent Group was the largest shareholder of TBP, owning 23.74% of its shares, and had been for approximately twenty years.

22.    In the years following the 2016 dispute between Prevent Group and Volkswagen, TBP had experienced a significant decline in its supply to Volkswagen when compared to previous years. TBP also stopped receiving invitations to bid for certain Volkswagen contracts, even though it had lower labor and logistics costs than other suppliers and had previously been a favored supplier of Volkswagen. TBP attributed its recent decline in business with Volkswagen to the dispute between Prevent Group and Volkswagen.

23.    TBP tried to mend its relationship with Volkswagen in 2020, to no avail. Due to what Volkswagen viewed as an "unfavorable ownership structure," Volkswagen confirmed it would not provide TBP with any new orders unless TBP forced Prevent Group to sell its stake in the company. TBP was also excluded from other Volkswagen manufactured brands. The lack of Volkswagen orders resulted in lost profits to TBP in the amount of millions of euros. Prevent Group's ownership also made it difficult for TBP to obtain other sources of capital, such as through commercial loans, since the banks would inquire how Prevent Group's ownership

of TBP affected its business volume with Volkswagen.

24.    As a result, TBP blamed Prevent Group for its exclusion from the supplier market for Volkswagen vehicles and the significant reduction in its sales revenue. TBP informed Prevent Group that once Prevent Group was no longer the majority shareholder, Volkswagen would no longer consider TBP a "risky supplier," and its sales volume would return to pre-2016 levels.

25.    As a result of Volkswagen's immense influence and TBP's economic distress, TBP bought Prevent Group's 23.74% ownership of TBP and Prevent Group was forced out of TBP.

26.    Volkswagen's abusive conduct also took place in the United States and impacted companies conducting business in the United States.  For example, in 2016, Prevent USA sought to acquire the Brazilian operations of Tower International, Inc. ("Tower"), a supplier headquartered in Livonia, Michigan.  Prevent USA's approaches to Tower's management in Michigan were rebuffed at every turn, with statements such as "Tower can not [*sic*] do a transaction with [Prevent USA]" and "***please ask the head of Purchasing for Volkswagen*** Brazil to advise us that they would have no issue if Tower Aruja [Brazil] were sold to your company."  Tower cited no other business reason for turning away the acquisition.

27.    Eventually, the truth came out.  In a conversation with a third-party advisor, the CFO for Tower's American operations admitted that Volkswagen made

Tower "*agree in writing that [Tower] would not sell to a Prevent associated company*."

28.     In an effort to continue developing its U.S. presence and the attractive proximity to the Mexican automotive and automotive component part industry, Prevent USA sought to acquire a number of suppliers located in Texas. Most recently, Prevent USA began negotiations to acquire a distressed automotive component part manufacturer, International Automotive Components Gmbh ("IAC"), with locations in Arlington, Texas. These negotiations began on a no-name basis and went well initially, with IAC expressing great interest in Prevent USA's overtures. Despite promising negotiations for the acquisition of IAC, after IAC learned that the would-be acquirer's identity was Prevent USA, affiliated with the Prevent Group, the negotiations abruptly stopped. On information and belief, including because IAC is one of the suppliers listed on Volkswagen's list of Prevent Group's potential acquisition targets, IAC backed out of its negotiations with Prevent USA solely due to Volkswagen's anticompetitive conduct.

29.     Volkswagen continues to preclude Prevent Group and its affiliate, Prevent USA, from the market for Volkswagen automotive component parts.

30.     The elimination of Prevent Group, and its affiliates, including Prevent USA, has allowed Volkswagen to enhance and maintain its market power over suppliers through exclusionary means, including by sending a warning to other

suppliers about what will happen if they stand up to Volkswagen's anticompetitive terms and prices.

31.    Prevent USA's damages from the lost profits that it would have generated from contracts with the suppliers is currently estimated in excess of $750 million.

32.    As a result of Volkswagen's anticompetitive conduct, Prevent USA has been banned from the market, and has suffered massive losses that strike at the core of its business and threaten its future in this "grow-or-die" industry.  Prevent USA was prepared to deploy at least $300 million for the acquisition of U.S.-headquartered suppliers.  Based on anticipated synergies and its demonstrated ability to run those companies more efficiently, Prevent USA projected a net return of between $750 million and $1 billion from those acquisitions.  Now, as a result of Volkswagen's anticompetitive conduct, the Prevent Group has been frozen from the market and deprived of those opportunities and profits, and has suffered additional harm to its competitiveness, and goodwill.

33.    Volkswagen's actions harmed not only Prevent USA and Prevent Group, but also the competitive structure of the Volkswagen automotive component part supplier market, many of its submarkets, and ultimately consumers of passenger vehicles.  If suppliers cannot obtain the scale and scope necessary to resist Volkswagen's dominance, then the market-wide response across its suppliers will

be to reduce output in the face of terms and prices that are below competitive levels. With fewer parts available, the quality of Volkswagen automotive component parts and automobiles suffers, as do the end purchasers of Volkswagen automobiles. By thwarting acquisitions that would have created a procompetitive counterbalance to its market power, Volkswagen has harmed competition and U.S. consumers.

34.     Prevent Group and Prevent USA have been pushing back against Volkswagen's illegal conduct for years. In 2019 and 2020, Prevent USA and Prevent DEV GmbH (Prevent USA's German affiliate) filed suits in United States District Court in the Eastern District of Michigan against Volkswagen and others, alleging that Volkswagen's conduct violated Sections 1 and 2 of the Sherman Act.[3] Both of these actions were dismissed on *forum non conveniens* grounds. Seemingly emboldened by these rulings, Volkswagen doubled down on its conduct and continued to deny Prevent Group and Prevent USA access to the market, including within the United States, the State of Texas, and this District.

35.     Accordingly, the Prevent Group brings this action against Volkswagen for treble damages under state and federal antitrust laws and for civil conspiracy and tortious interference under the laws of Texas.

---

[3] These actions were styled *Prevent USA Corporation et al. v. Volkswagen AG et al.*, Case No. 2:19-cv-13400 (E.D. Mich. 2019) and *Prevent DEV GmbH v. Adient PLC et al.*, Case No. 2:20-cv-13137 (E.D. Mich. 2020).

## **VENUE AND JURISDICTION**

36.     This Court has jurisdiction under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331

and 1337.  Prevent USA seeks relief under Section 1 of the Sherman Act, 15 U.S.C.

§ 1, Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 4 of the Clayton Act, 15

U.S.C. § 15, and Section 16 of the Clayton Act, 15 U.S.C. § 26. Jurisdiction is also

proper under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000

and the action is between citizens of different States under 28 U.S.C. § 1332(a)(1),

and between citizens of a State and citizens or subjects of a foreign state under 28

U.S.C. § 1332(a)(2).

37.     This Court has jurisdiction over the state law claims under 28 U.S.C.

§ 1367 because the state law claims are so related to the federal antitrust claims as to

form part of the same case or controversy.

38.     Venue is proper in this District under 15 U.S.C. §§ 15(a) and 22 and 28

U.S.C. § 1391.  Volkswagen transacts business in the United States, including  in

this District.  Volkswagen maintains a corporate office in this District and makes

vehicle sales to Volkswagen dealers located in this District. A substantial part of the

events giving rise to this Complaint occurred in this District.  Volkswagen's illegal

conduct had a direct, substantial, and reasonably foreseeable effect on interstate

commerce in the United States, including in this District.  These effects include:

(a)     Foreclosure of Prevent USA from supplying automotive

component parts to downstream purchasers, including to purchasers located in the United States;

(b)   Artificial restriction of market output in the Volkswagen automotive component part market;

(c)   Artificially depressed prices in the Volkswagen automotive component part market; and

(d)   Artificial restriction of procompetitive acquisitions with Texas-based and other U.S.-based companies.

39.   Defendants are subject to the personal jurisdiction of this Court because:

(a)   Texas' long-arm statute, TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041-17.045, which extends jurisdiction as far as the federal constitutional requirements of due process will permit, provides for specific jurisdiction over nonresident defendants who do business in the State;

(b)   Defendants engaged in acts constituting doing business in Texas because, as alleged in this Complaint, Defendants purposely transacted business in Texas and contracted to provide services to be rendered or for materials to be furnished in the State, and committed a tort in this State, and these acts gave rise to the causes of action alleged in the Complaint;

(c)   Defendants purposefully entered into a conspiracy and

performed unlawful acts in furtherance of the conspiracy, in or from this District, including negotiating and executing agreements between Volkswagen and other co-conspirators to stop purchasing automotive components from Prevent USA in violation of federal and state antitrust law, and state tort law, to their benefit;

(d)     Defendants purposefully availed themselves of the privilege of transacting business within the forum State, establishing minimum contacts with this District sufficient to satisfy due process;

(e)     The exercise of personal jurisdiction by this Court does not offend traditional notions of fair play and substantial justice;

(f)     Defendants are amenable to service of process under Federal Rule of Civil Procedure 4(k)(1)(A);

(g)     Defendants are subject to specific personal jurisdiction of this Court because they have purposefully directed their contacts and conspiratorial conduct at the United States, including the forum state, and have purposefully availed themselves of the laws of the United States. As alleged, Defendants engaged in conspiratorial activities and anticompetitive conduct that they intended to have, and did have, direct, substantial, and reasonably foreseeable effects on commerce throughout the United States, including the forum state.

A.     **Parties**

1.     **Plaintiff**

40.     Plaintiff Prevent USA is a corporation formed under the laws of the State of Texas. Prevent USA maintains offices and warehousing at 510 and 511 N. Washington Avenue, Marshall, TX 75670. Prevent USA is a wholly-owned subsidiary of Prevent Holding GmbH.

41.     Prevent USA is also affiliated with the Prevent Group, a network of companies, that is engaged in the worldwide supply of various automotive component parts and is owned by the Hastor Family.

2.     **Defendants**

42.     Defendant Volkswagen AG, or the Volkswagen Group, is a corporation organized and existing under the laws of Germany with its principal place of business in Wolfsburg, Germany.

43.     Defendant Volkswagen Group of America Inc. is a limited liability company organized and existing under the laws of New Jersey with its principal place of business in Herndon, Virginia. Volkswagen Group of America Inc. maintains twenty operational facilities across the United States, including a corporate office in Fort Worth and Houston, Texas. Volkswagen Group of America Inc. is a wholly owned subsidiary of Volkswagen AG. Through Volkswagen Group of America Inc., Volkswagen AG, among other things, manufactures, distributes, and

markets vehicles for sale in the United States.

44.     The Volkswagen Group is one of the largest manufacturers of passenger vehicles in the world by sales volume—second only to Toyota Motor Corporation, a Japanese passenger vehicle manufacturer.  The Volkswagen Group markets passenger vehicles under several brands, including Audi, Bentley, Bugatti, Lamborghini, Porsche, SEAT, Škoda, MAN, Scania, Ducati, Cupra, and its namesake brand, Volkswagen.  In 2021, it had roughly €250.2 billion ($265.3 billion) in revenue.

### B.     The Supplier Market for Volkswagen Automotive Component Parts

#### 1.     The Relevant Product Market

45.     The conduct of Defendants described in this Complaint affects interstate trade and commerce. Volkswagen's collective annual revenue through the manufacture and sale of vehicles is roughly €250.2 billion ($265.3 billion), including €45.3 million ($48.01 million) in sales in North America.

46.     The average car has tens of thousands of individual component parts. Large carmakers (known in the industry as "Original Equipment Manufacturers," or "OEMs"), for the most part, do not manufacture those parts themselves.  Instead, they source parts from an array of automotive component part suppliers.

47.     Automotive component parts are not to be confused with aftermarket automotive parts like replacement windshield wipers or spark plugs, for example,

which are sold to consumers in retail outlets and can generally be used in cars manufactured by different OEMs.

48.   Automotive component parts, by contrast, are generally made to the specifications of an OEM and are sold directly to those OEMs. The relevant product market impacted by Defendants' anticompetitive conduct is the supplier market for automotive component parts specifically manufactured for Volkswagen vehicles and purchased by Volkswagen for production of their vehicles.

49.   The relevant market impacted by Defendants' anticompetitive conduct includes submarkets as well. The broader market implicated by Volkswagen's conduct is the market for Volkswagen automotive component parts. The submarkets relevant to this Complaint consist of the markets for specific Volkswagen automotive components, including but not limited to the following:

(a)   Interior seat structures and seat components;

(b)   Metal automotive body structures;

(c)   Engine and transmission components;

(d)   Interior electronics;

(e)   Plastic interior and exterior trim;

(f)   Air systems and fuel management systems; and

(g)   Control and structural system components.

50.   Automotive component parts made specifically for Volkswagen

vehicles cannot be used in other car company vehicles, and as such, Volkswagen is the sole purchaser of these specifically made automotive component parts. Due to the specifications of each OEM and the high costs related to shifting the production of automotive components from one OEM to another, suppliers such as Prevent Group cannot substitute lost sales to Volkswagen with sales to other OEMs. In response to a non-transitory change in terms and prices offered by Volkswagen, producers of Volkswagen automotive components could not shift their sales to another OEM.

### 2.    The Relevant Supply Chain

51.    The automotive manufacturing market is generally characterized by a three-tier supply chain illustrated by the diagram below.



### 3.    Tier 3 Suppliers

52.    At the beginning of the supply chain are Tier 3 suppliers.  Tier 3 suppliers sell raw, or nearly raw, materials like metal, plastic, textiles, and leather.

### 4.    Tier 2 Suppliers

53.    Tier 3 suppliers sell those raw materials to Tier 2 suppliers. Tier 2 suppliers use those materials to make component parts, although some Tier 2 suppliers are vertically integrated and themselves produce the necessary raw materials instead of relying on a separate Tier 3 supplier. Tier 2 suppliers often specialize, focusing on manufacturing a particular part or class of parts. A supplier of interior electronics, for example, is a Tier 2 supplier. Tier 2 suppliers typically sell their components to Tier 1 suppliers.

54.    During the relevant period, Prevent USA and Prevent Group were Tier 2 suppliers attempting to acquire other Tier 2 suppliers and Tier 3 suppliers to sell to OEMs, such as Volkswagen, and Volkswagen owned car companies, such as Audi, Bentley, and Porsche.

### 5.    Tier 1 Suppliers

55.    Tier 1 suppliers incorporate the Tier 2 component parts into a larger or more complicated component or an assembly of multiple components. Tier 1 suppliers then sell their component parts directly to OEMs. Tier 1 suppliers specialize in automotive grade parts, typically built to the specification of a particular OEM. Suppliers of audio systems, for example, are Tier 1 suppliers.

56.    OEMs often negotiate purchase prices, quantities, and product specifications with Tier 1 suppliers several times over the duration of a contract.

57.     Volkswagen makes weekly or monthly orders to Tier 1 suppliers, who in turn order the necessary quantities from Tier 2 suppliers.

### 6.     OEMs

58.     OEMs are at the final level of the supply chain.  These end-product manufacturers design, assemble, and market vehicles for sale to consumers. Volkswagen is an OEM. Although it purchases parts directly from Tier 1 suppliers, Volkswagen deals directly with suppliers at every level in the supply chain to source specific component parts.  In the Volkswagen interior seating market, for example, Volkswagen determines the permitted fabric and leather suppliers in the Tier 3 market, the seat warmer suppliers in the Tier 2 market, and the completed seat supplier in the Tier 1 market.  For each level, Volkswagen deals directly with suppliers, either through direct purchases or through a direct supplier relationship, in which Volkswagen specifies with a Tier 1 supplier the contractual terms that must be agreed to by specific Tier 2 or Tier 3 suppliers as conditions of the Tier 1 contract.

59.     Volkswagen thus dictates suppliers, prices, product specifications, purchase volumes, and sales terms at every level in its supply chain.  Volkswagen refers to its multilevel involvement as "digging deep" into its supply chains.

### 7.     Defendants' Market Power Over Suppliers

60.     Volkswagen has monopsony power in the market for Volkswagen automotive component parts, including in the relevant product submarkets.

Monopsony power exists when a buyer, rather than a seller, has power in the purchasing market sufficient to restrain competition, including the power to force a supplier to do something that the supplier would not do in a competitive market.

61.     Buyers with such monopsony power can restrict output and lower prices and terms below competitive levels.  In response to these suppressed prices and terms, suppliers must lower their output—that is, produce fewer components. With fewer units of various automotive component parts available, OEMs reduce the quality and increase the price of their end product (here, passenger vehicles), which harms end-consumers in the long run.

62.     Volkswagen's monopsony power is apparent from its ability to impose infracompetitive—that is, below market level—prices and terms on its suppliers.

63.     This economic result occurs market-wide and may not be observable on a contract-by-contract basis, especially because OEMs enter requirements contracts that dictate quantity.  It also may be somewhat counterintuitive that market power exerted to *reduce* prices could also result in harm to consumers.  But antitrust law and economics have long recognized that these abuses of market power over suppliers, when observed in the long-run, reduce output, harm competition, and ultimately harm consumers. "Vertical integration can produce significant cost reductions by enabling the integrating firm to achieve two kinds of efficiencies. 'Production' efficiencies refer to savings in the cost of producing or distributing a

good. 'Transactional' efficiencies refer to cost reductions that result from the firm's avoidance of the marketplace, with its attendant costs and risks." *See* Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 575 (4th ed. 2013–18) ("The monopsonist, like the monopolist, 'exercises' its power by reducing output, in this case in the market in which it purchases."); *id.* at ¶ 1637 (noting, for example, "[m]anufacturers with monopsony power . . . might use that power to force the dealer's markup to infracompetitive levels.  The result, as in all cases of monopsony, would be a reduced supply of dealership services."); *id.* at ¶ 2011 (noting that when a monopsonist also has market power in the resale market "the counterintuitive but nevertheless robust result is reduced output and *higher* prices in the resale market").

64.    *First*, Volkswagen's monopsony power was wielded by requiring struggling suppliers, which were heavily reliant on Volkswagen's business, to sell finished components at prices at or below the suppliers' cost of production, and in some instances, below the price those manufacturers paid for the raw materials. Those suppliers effectively subsidized every component part sold to Volkswagen.

65.    For example, Volkswagen required a supplier called Rioglass S.A. ("Rioglass") to sell components at a price below the cost of raw materials.  This period of infracompetitive pricing persisted for more than two and a half years, including after price renegotiations, without Rioglass switching production capacity

to a different OEM.  In another example, before Prevent Group acquired Car Trim GmbH ("Car Trim"), Car Trim's contract prices and terms with Volkswagen forced Car Trim to operate at a loss.  This period of infracompetitive pricing continued for at least a year, during which Volkswagen required additional price cuts. The same was true for Eybl Austria GmbH, which Volkswagen required to accept prices below the cost of making the finished component.  These infracompetitive prices were often exacerbated by required annual price cuts, which Volkswagen successfully imposed on its suppliers.

66.    *Second*, Volkswagen conditioned continued business on suppliers making certain technical product changes.  For example, Volkswagen would issue a demand to the supplier that it manufacture certain portions of a seat using lower quality leather.  Within days of the demand, Volkswagen would lower the price it would pay for the seats to reflect the lower-cost product.  Volkswagen then refused to purchase the already-produced (higher-quality) unchanged goods at the original agreed upon price. The effect of this conduct was to artificially lower the price of the component parts.

67.    In other instances, Volkswagen would require a change that increased the material cost of the part while forcing the supplier to bear those increased costs. Volkswagen would issue a demand for the product change—thicker steel, for example.  Then suppliers would manufacture the costlier products, but Volkswagen

would refuse to pay a higher price for the higher-quality parts, forcing suppliers to bear the full cost of the improvement. The effect of this behavior is to artificially lower the price of the improved goods.

68.     *Third*, Volkswagen calculated the price it would pay using a method that systematically drove prices below competitive levels. This method, used in Volkswagen's Requests for Quotations ("RFQs"), did not include the depreciation cost of plants and equipment, the cost of modifying a plant to meet the technical demands of Volkswagen, or various unanticipated costs. In other words, Volkswagen refused to account for any unanticipated change in costs over the life of the contract like, for example, rising costs of essential inputs like labor, raw materials, or energy. The calculation method also did not include, for example, indemnity for suppliers for the costs of winding down a plant when Volkswagen unexpectedly cancelled or dramatically reduced its demand. Requiring suppliers to bear the full risk and cost of these changes can quickly lead to suppliers being forced to produce components at a loss.

69.     *Fourth*, Volkswagen required suppliers to pay what it called "Quick Savings," or (formerly known as) "Pay to Play Payments," which are large upfront payments suppliers must pay to be awarded a new Volkswagen contract. These upfront payments were not included in Volkswagen's RFQs, meaning the supplier did not recoup the cost of the payment during the contract period. One German

researcher discussed this business practice, noting, "[t]he motor vehicle industry is especially prone to corruption because of business practices that encourage suppliers to put up large sums to win contracts."[4]

70.   *Fifth*, Volkswagen required suppliers to enter multi-year contracts under which Volkswagen required suppliers to make annual 3% price cuts, without considering inflation or increased cost of materials.  This pricing strategy, which Volkswagen calls "Global Sourcing," is used to artificially reduce the purchase price for component parts.  When a Tier 1 supplier was contracting with Volkswagen directly, the Tier 1 supplier passes on any required price reductions to the Tier 2 and Tier 3 suppliers, which thus bear the costs of any price reductions. The Tier 2 supplier cannot in turn pass on the cost of the price reductions to the Tier 3 suppliers, as Volkswagen also directs and controls the prices and costs on a Tier 3 level. As the OEM, Volkswagen controls the entire supply chain, including the prices for any raw materials.

71.   Volkswagen was able to achieve these infracompetitive prices and terms across its supplier base, including in the relevant product markets.  The effect of these prices and terms was to drive the price of automotive component parts below levels that would exist in a competitive market.

---

[4] JUST AUTO, Germany: *Auto Industry Particularly Prone to Corruption*, July 27, 2006 (last accessed Nov. 8, 2019).

72.    All of this establishes Volkswagen's durable ability to impose prices and terms that suppliers would not accept in a competitive market—a hallmark of monopsony market power.

## VOLKSWAGEN'S RELATIONSHIP WITH PREVENT GROUP

### A.    The Parties Enjoy an Amicable Supply Relationship While Prevent Group Remains Small and Compliant.

73.    At its inception in the early 1990s, Prevent Group's small manufacturing business largely involved cutting and sewing leather and textile seat covers.

74.    In the early 2000s, Tier 1 suppliers began buying Prevent Group components to use in Volkswagen and other OEM vehicles.

75.    At the time, Prevent Group was a mid-size supplier heavily dependent on Volkswagen's business.  Exploiting the dependence of the Prevent Group on its business, Volkswagen frequently required Prevent Group to make price reductions, consistent with Volkswagen's usual practices, described above.  In order to maintain its relationship with Volkswagen, Prevent Group accommodated these price reductions.

76.    Volkswagen purchased Prevent Group's component parts for incorporation in several of its passenger vehicles including: Golf A7, Audi Q3, VW Up, Passat, Amarok, Crafter, Phaeton, Touran, Touareg, Tiguan, Skoda Octavia, Porsche Cayenne, Audi A4, and Audi A1. Volkswagen Group assembled these

vehicles, which incorporated Prevent Group's component parts, in Europe and sold them globally, including in the United States.

77.     Recognizing Prevent Group's operational performance, high quality, and low margins, Volkswagen awarded Prevent Group several "Supplier of the Year" awards.

### B.     Prevent Group Begins Acquiring Struggling Suppliers and Becomes a Threat to Volkswagen's Market Power.

78.     Prevent Group continued to grow in both size and product scope until it began a growth and diversification strategy that directly jeopardized Volkswagen's ability to maintain and exploit its market power: the acquisition of distressed and underperforming suppliers. These acquisitions both expanded Prevent Group's product line and allowed Prevent Group to produce interior components more efficiently by vertically integrating[5] into certain Tier 1 and Tier 3 segments of the supply chain.

79.     From 2008 to 2015, Prevent Group acquired nearly two dozen automotive suppliers. These acquisitions included Austrian interior parts supplier Eybl Austria GmbH, with several plants in Austria, Hungary, Germany, Romania,

---

[5] "Vertical integration can produce significant cost reductions by enabling the integrating firm to achieve two kinds of efficiencies." Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 757 (4th ed. 2013–18). "'Production' efficiencies refer to savings in the cost of producing or distributing a good." *Id.* "'Transactional' efficiencies refer to cost reductions that result from the firm's avoidance of the marketplace, with its attendant costs and risks." *Id.*

and Slovakia in 2008 and 2009, French automotive leather supplier Montbrun, French automotive glass supplier Rioglass in 2009, German seat structure supplier TWB GmbH & Co. KG in 2010, Austrian leather supplier Lederfabrik Vogl in 2011, and German cast iron gearbox supplier ES Automobilguss GmbH in 2015.

80.     At the time of Prevent Group's acquisitions, suppliers faced increased financial difficulty from relentless cost pressure from Volkswagen that brought many to the brink of insolvency.  Without an acquisition, those suppliers could not have continued to operate.

81.     During this period of growth, Prevent Group was known among suppliers and across the automotive industry for its track record of turning around underperforming or failing suppliers.  Prevent Group developed highly effective restructuring techniques, streamlined manufacturing, and leveraged existing competencies and relationships into new segments of the market.

82.     Prevent Group also grew organically through investments in certain Tier 3 supply chain segments.  In 2006, for example, Prevent Group built a leather tannery in Bosnia and Herzegovina to supply its own high-quality, low-cost leather for use in its interior leather components.

83.     As Prevent Group grew, it achieved more bargaining power to insist upon competitive prices and terms, directly threatening Volkswagen's strategy of keeping its suppliers small and weak and thereby allowing Volkswagen to force

anticompetitive prices and terms on those suppliers.  Prevent Group acquiring smaller, weak suppliers posed a direct threat to Volkswagen's market power strategy.  Volkswagen could no longer force its suppliers to accept terms and prices below competitive levels.

### C.    Prevent Group's Acquisition of Car Trim Is the "Last Straw" for Volkswagen.

84.    In April 2016, with Volkswagen mired in scandal, Prevent Group continued to pursue its acquisition strategy through the purchase of Car Trim, a Tier 2 supplier of leather seat covers, interior components, and complete seats. Before the acquisition, Car Trim had at least two running contracts and two future contracts with Volkswagen that had been executed in late 2015. Under the two future contracts, Car Trim would perform cutting and sewing services for two Volkswagen Group vehicles, the Volkswagen Touareg and the Porsche Cayenne, with delivery starting in 2017 and 2018, respectively.  Under the terms of the running contracts, Volkswagen imposed prices and terms that caused Car Trim to operate at a loss. When Volkswagen and Car Trim contracted for those goods in 2015, Car Trim was financially distressed and highly dependent on Volkswagen as its only large OEM customer.  Car Trim faced the comply-or-die decision:  Without the Prevent Group deal, Car Trim would be insolvent.  But with the deal, Car Trim had a chance to survive long enough to complete the Volkswagen contracts.  Car Trim accepted.

85.    In April 2016, Prevent Group announced it was acquiring Car Trim.

86.    Prevent Group's acquisition of Car Trim allowed Prevent Group to maintain the productive capacity of Car Trim, increasing the overall output of automotive interior seat components.  The acquisition also allowed Prevent Group to take advantage of productive efficiencies by integrating Car Trim's complementary manufacturing assets.

87.    Before Prevent Group's acquisition of Car Trim, Volkswagen was set to benefit mightily from its two contracts with Car Trim.  But as Volkswagen feared, Prevent Group's acquisition transformed Car Trim from a compliant participant in Volkswagen's abuse of market power into a company with enough bargaining power to resist it.

88.    For Volkswagen, the Car Trim acquisition proved that consolidation among lower-tier suppliers represented the biggest threat to Volkswagen's ability to control its supply chain, particularly Tier 2 and Tier 3 suppliers.  If a supplier like Prevent Group could stand up to Volkswagen's unfair practices and acquire similar small, distressed suppliers, without the prior consent of Volkswagen, then Volkswagen could no longer force its suppliers to accept terms and prices below competitive levels.  This risk was especially acute at a time when Volkswagen was dealing with the fallout of the Dieselgate scandal.  The European press described the resulting standoff between Volkswagen and Prevent Group as a "David versus Goliath" story that represented a potential change in the power dynamics of OEMs

and their supply chains.

89.     Volkswagen responded immediately.  Within two months of the acquisition, on June 28, 2016, Volkswagen cancelled the two new contracts with Car Trim—now a subsidiary of a Prevent Group affiliate—on one-days' notice. Car Trim stopped deliveries to Volkswagen in August 2016.

### D.     Volkswagen Launches "Project 1."

90.     Shortly after it cancelled its contracts with Car Trim, Volkswagen began to address the threat of the Prevent Group with an organized, methodical, and institutional response.  At the highest levels of the Volkswagen Group, Volkswagen commenced a series of meetings under the code-name "Project 1."[6]

91.     Project 1 was highly confidential.  Members of the group were instructed to destroy documents and communications related to the scheme.

92.     Project 1 had an explicit focus: to remove Prevent Group from the market, and thereby deter remaining suppliers from posing any similar threats to Volkswagen's market power.  This goal is confirmed by internal Project 1 presentations, which refer to the "destruction" and "demolition" of the Prevent Group.

93.     Project 1 had both a short-term and a long-term component. *First*,

---

[6] Prevent Group's knowledge of Volkswagen's conduct, including Project 1, is from internal Volkswagen documents. Quotes of written Volkswagen materials throughout the Complaint are unofficial translations from German.

Volkswagen would wreak havoc on Prevent Group's liquidity and short-term viability by cancelling all existing contracts with Prevent Group and its affiliates. At the same time, Volkswagen would mislead Prevent Group about their future supply relationship so Prevent Group would not have time to find alternative business. *Second*, Volkswagen would ensure that its suppliers, especially its Tier 2 and Tier 3 suppliers, remained small, fragmented, and vulnerable to Volkswagen's market power by putting a stop to any further acquisitions by suppliers like Prevent Group, thus ensuring Volkswagen's continued monopsony power.

94.    Volkswagen's anticompetitive goal is apparent from its internal meetings about Project 1.  In internal slide presentations, Volkswagen outlined the factors in a supplier acquisition that would give rise to "***increased risk potential***" for Volkswagen.  These included, as admitted in Volkswagen's documents, "***negative purchase prices***."  The documents also flagged the risk of consolidation among suppliers with high reliance on Volkswagen—in other words, the suppliers most vulnerable to Volkswagen's market power.  Prevent Group, in particular, Volkswagen representatives warned, "***continue[d] to actively exert pressure on Volkswagen through further takeovers!***"

95.    The presentations further summarized Volkswagen's goals of "scouring the supplier portfolio" for additional "***small to mid-size suppliers with high dependency potential***," implementing pre-acquisition options in contracts with

suppliers that include the right to refuse acquisitions for "quality issues," checking existing "pre-purchase options to get visibility into potential sales," and "*[i]nfluenc[ing] consequently the M&A activities of global players*."

96.     As part of these efforts, Volkswagen maintained an expansive internal spreadsheet that carefully tracked the financial health of suppliers in every level of its supply chain.  This spreadsheet—referred to internally at Volkswagen as "the "*Problematic Suppliers List*" (hereinafter, the "List")—included external financial ratings for each supplier, each supplier's reliance on Volkswagen by percentage of sales, a "depth rating" for each supplier, and Volkswagen's plans for thwarting each supplier's sale to Prevent Group.  In the "status" column, Volkswagen recorded any information on change of control, including whether a potential purchaser had signed a Letter of Intent to purchase the supplier, and the identities of potential acquirers.

97.     For example, in a row for Finoba Auto ("Finoba"), Volkswagen lists the following information:  Finoba sells 65% of its volume to Volkswagen; Finoba is included on the List because "core business not profitable, high debt, high dependency, Chinese has taken stakes;" "[t]alks between the managing shareholder and Völkswagen took place;" and as next steps, "[p]ossibly Change of Control and standard monitoring."

98.     The List demonstrates that Volkswagen regularly entered "Letter of Comfort" agreements with failing suppliers to block Prevent Group's takeover

attempts.  For example, in the row for one supplier noted as an acquisition risk, Alu Menziken Euromotive GmbH, Volkswagen writes as next steps: "Agreement of general LOC including information requirement or non-procurement recommendation."  Another supplier, AD Plastik D.D., appears on the List with an entry (attributed to Volkswagen Risk Management) that "[d]ue to historical connections to Prevent we recommend placing on the watchlist."

99.     The Volkswagen entities and business divisions identified on the List as responsible for identifying and managing the relationships with the potential targets included Defendant Volkswagen Group of America.  Volkswagen Group of America contributed at least four suppliers to the List.  For example, the List says that for one supplier, FTE, Volkswagen Group of America is noted the "origin" of FTE's inclusion on the List, and FTE's risk rating is noted as "estimated by VWGoA."

100.    Despite March 2018 meetings between executives from Volkswagen and Prevent Group where Volkswagen misled Prevent Group into believing that Volkswagen would continue their supply relationship, that very same month, executing its Project 1 strategy, Volkswagen abruptly cancelled all existing long-term contracts with Prevent Group.  In total, Volkswagen issued over a dozen cancellations, including for all existing contracts between Volkswagen and the following Prevent entities:  Prevent DEV GmbH, Prevent TWB GmbH & Co. KG,

Eastern Horizon Group Netherlands B.V., Prevent Foamtec GmbH, ES Automobilguss GmbH, Car Trim GmbH, and Eybl Austria GmbH.

## **DEFENDANTS' TORTIOUS AND ANTICOMPETITIVE CONDUCT**

101.   Demonstrating its monopsony market power, Volkswagen extracted agreements from suppliers promising Volkswagen that the suppliers would not sell themselves or their assets to any company in the Prevent Group.

102.   On August 16, 2016, Sebastian Oliver ("Oliver"), a Corporate Sourcing Analyst in the Volkswagen Interior Procurement division, gave a presentation about the Volkswagen supplier base.  In the presentation, Oliver outlined Prevent Group acquisitions that would have "increased risk potential" for Volkswagen.  Oliver then identified specific "increased risk" acquisition targets.  These included certain European-based suppliers, in addition to American companies such as Visteon Corporation, which is headquartered in Van Buren Township, Michigan, and IAC, which maintains several U.S. based locations, including in Arlington, Texas.

103.   Volkswagen devoted significant resources to excluding Prevent Group from the market. In an internal Project 1 presentation from January 2017 discussing how to replace Prevent Group as a supplier, Volkswagen noted: "***The commissioning of the alternative suppliers entails extensive investments to the tune of millions of euros for the alternative suppliers***." The presentation noted that Ralf Brandstätter, then Chief Executive Officer of Volkswagen, was tasked with

managing the completion of the replacement suppliers. Volkswagen estimated that the replacement of Prevent Group companies would cost it roughly 200 million euros. These anticipated costs mainly included legal costs of defending lawsuits for its misconduct.

104.   The replacement of all Prevent Group companies as suppliers to Volkswagen was approved at the highest levels of the company. In a November 2016 Project 1 presentation, Volkswagen writes that, "In accordance with a resolution by the Management Board, "*alternative suppliers and safeguards have been developed and in some cases, already commissioned for the companies of the Prevent Group. These measures are currently being implemented*."

### A.   Volkswagen Enters Agreements with Suppliers to Boycott Prevent Group and its Affiliates.

105.   The design of Project 1 was to eliminate Prevent Group from the market and destroy the company.

106.   Volkswagen's exclusion of Prevent Group was against Volkswagen's own rational economic interest: Prevent Group was the cheapest, most efficient competitor and supplier. As reported by Business Insider, Volkswagen knew that directly excluding Prevent Group from the bidding process would be too obvious because it would be both counter to their own business interests and "smell[] too much like an agreement." Quoting the recordings from the Project 1 meetings:

During one recorded session, a manager

asked, "How do we modify the bidding lists so that we don't end up asking Prevent separately?" [ . . . ]

"Prevent produces at dumping prices, would be the cheapest supplier, and would thus move up the lists," another manager on the recording said.

"In this case, one would have to decide not to proceed according to the 'best bid' principle," another Volkswagen manager said.

Removing Prevent from the bidding list would be "very suspicious."

"***It smells too much like an agreement***," another said.

107.   To avoid these problems, Volkswagen came up with a solution outside of the normal bidding process with two suppliers of automotive seats, Adient plc ("Adient") and Lear Corporation ("Lear"), together accounting for the vast majority of the automotive seat market share. According to information made available to Prevent Group, Volkswagen approached all four major Tier 1 suppliers of automotive seats—Adient, Lear, Magna International, and Faurecia SE—with a proposed agreement to boycott Prevent Group by refusing to purchase seat covers from it in exchange for guaranteed future automotive seat cover contracts, including on contracts Volkswagen presently had with Prevent Group. Magna declined to enter into the illicit agreement. Faurecia also declined, but did temporarily reduce the number of contracts entered into with Prevent Group, anticipating that Prevent

Group might go bankrupt as a result of the boycott. Adient and Lear, on the other hand, agreed.

108.   With respect to Adient, Volkswagen representatives, including Head of Group Procurement for Interior, Rainer Stutz, had meetings with the then Chief Executive Officer and Chairman of Adient, R. Bruce McDonald, at Adient's headquarters in Plymouth, Michigan. Ralf Brandstätter, the Volkswagen executive that oversaw much of Project 1, also had phone calls with Adient and Lear representatives related to the boycott.

109.   In return for agreeing to foreclose Prevent Group from the market, Adient and Lear would get lucrative contracts to replace Prevent Group as Volkswagen's automotive seat cover supplier without having to conduct an open bidding process. For Adient and Lear, the deal was a win-win. Not only would they earn higher margins for the replacement seat covers sold to Volkswagen outside of the normal competitive bidding process, but suffocating Prevent Group would also mean one less competitor for the sale of Volkswagen seat covers.

110.   In 2018, armed with their agreement with Volkswagen, Adient and Lear abruptly cut all ties with Prevent Group. Adient and Lear stopped sending any RFQs for potential new business, effectively cutting Prevent Group out by depriving Prevent Group the opportunity to bid on new projects.

111.   This behavior was in stark contrast to a number of other leading Tier 1

suppliers, such as Magna and Faurecia, and in stark contrast to the relationship between Prevent Group and Adient and Lear before 2018. Since then, Prevent Group has received no new RFQs from Adient. Adient even refused to respond to any emails or calls from Prevent Group representatives about the reason Prevent Group stopped receiving RFQs.

112.    Although some revenue continued from previous contracts before the conspiracy, revenue from Lear and Adient dropped off dramatically following the agreements with Volkswagen, reducing to none by 2020.

**B.    Volkswagen Enters Agreements with Suppliers to Block Acquisition by Prevent Group.**

113.    Volkswagen's efforts to exclude an affiliate of Prevent Group from the market went beyond replacing them as a supplier and included intervening with Prevent Group's acquisitions of other suppliers. To do this, Volkswagen had to ensure that Prevent Group was both replaced as a Volkswagen supplier and prevented from acquiring suppliers or their operations. Volkswagen did this in several ways, including by (i) making misleading statements to the acquisition targets' shareholders to induce the shareholders to reject Prevent Group's offers; (ii) soliciting and securing alternative offers or buyers; (iii) contacting the acquisition targets' other large customers to convince those customers to oppose the transaction; (iv) directly lobbying shareholders and other directors to vote against or otherwise block a proposed transaction; and (v) entering option agreements under which

Volkswagen could purchase the company in the event of an acquisition it did not like.  Volkswagen even hired private investigators to investigate more than two dozen Prevent Group executives.  On information and belief, Volkswagen did so in an effort to gather more information about Prevent Group's potential takeover targets.

114.   Volkswagen used several of these illicit tactics to block an affiliate of Prevent Group from acquiring Grammer, a publicly listed German supplier of car seats, armrests, and head rests, in 2016 and 2017.  Grammer had significant operations in the United States, which made it an attractive acquisition for Prevent Group. Volkswagen had listed Grammer as an "increased risk" acquisition and acted quickly to find a solution to Prevent Group's impending acquisition.

115.  On August 16, 2016, the same day that Volkswagen executives discussed the "lessons learned" from Prevent Group's Car Trim acquisition, Ralf Brandstätter discussed the actions necessary to prohibit Prevent Group from acquiring additional shares in Grammer.  At this point, Prevent Group had acquired about 10% of Grammer's shares.

116.  To block the acquisition, Brandstätter recommended contacting Grammer management and other Grammer shareholders to convince them to vote against Prevent Group's takeover attempt.  Brandstätter also recommended involving other Grammer customers in the scheme.

117.   Volkswagen then met with Grammer management to develop a plan to block Prevent Group's acquisition.  On September 19, 2016, a Volkswagen Board of Management member met with the CEO and Chairman of Grammer to discuss blocking the Prevent Group acquisition.  On Volkswagen's instruction, the Grammer CEO agreed not to communicate any more with Prevent Group.  The parties also agreed that Grammer would discuss all actions related to finding an alternative customer with Volkswagen before acting.

118.   On September 22, 2016, Volkswagen prepared a summary for the Board of Management explaining why blocking Prevent Group's acquisition of Grammer was essential.  Grammer was highly dependent on Volkswagen. Volkswagen included Grammer on its List.  Volkswagen described the reason for Grammer's inclusion on the List as "[e]ntry of Prevent as single largest shareholder." The status column reads: "Several discussions with Grammer executive board and Grammer specialist departments, *no new contracts without protection against a takeover by Prevent*."

119.   On January 11, 2017, a Volkswagen status report shows some of the specific steps that it took to interfere with the acquisition.  These included inducing the Grammer board to announce Grammer would not receive business from "bigger customers" if the shareholders agreed to Prevent Group's acquisition attempt.  At the time of the Grammer board meeting, the Volkswagen report indicates that the

statement was "in progress."

120.   In May 2017, as a result of these tactics, Grammer shareholders voted to back management and block Prevent Group's acquisition attempt.

121.   In another example, Prevent Group sought to acquire Groclin, a Polish supplier of automotive seat covers, car seats, and other automotive upholstery. Volkswagen quickly intervened.  Like Grammer, Groclin had been on Volkswagen's List.  In the status column, Volkswagen wrote, "Agreement on the signing of an information *agreement and pre-emptive rights after became known that Groclin wants to sell automotive business (Interested parties include Prevent)*."  In the "next steps" column, Volkswagen wrote, "One-on-one strategy meeting on 28.02.17 between Groclin, Procurement and Risk Management is to define future forms of cohesion."

122.   A few months after that "strategy meeting," on May 4, 2017, Groclin entered an option contract with Volkswagen that gave Volkswagen the option to purchase Groclin if it was set to be acquired.  Under the contract, Volkswagen could either purchase Groclin itself or "appoint a third party to join the purchase agreement instead of the potential shareholder."  The contract gave Volkswagen ten working days to exercise the option from the date Groclin entered a final sales contract.

123.   The contract also required Groclin to notify Volkswagen of any potential sale, including the identity of the potential acquirer.

C.    **Volkswagen's Campaign to Block the Prevent Group from Acquiring Suppliers Took Place in the United States.**

124.    In 2014, Prevent Group began to develop a strategy to acquire suppliers located in the United States through their affiliate Prevent USA.

125.    At the time, Prevent Group's product portfolio focused largely on interior component parts, including the interior leather components and automotive seats that had historically been the specialty of the brand.  However, by this point, Prevent Group had also grown its product line to include other components.

126.    Prevent Group's U.S. acquisition strategy had two principal aims: *first*, to strengthen its American presence by acquiring underperforming or distressed American suppliers within its existing product line; and *second*, to diversify by acquiring underperforming or distressed American suppliers of components outside its existing product line, including metal materials and components like break disks and engine components.

127.    To struggling suppliers, Prevent Group had all the elements of a desirable acquirer, including:  experience in the component part market, a long track record of acquiring and turning around distressed suppliers, strong financial footing, and existing relationships across the North American supply chain, including with Tier 1 suppliers like Johnson Controls/Adient, Lear, MAT, Magna, and Faurecia.

128.    Prevent Group devoted substantial effort and resources towards this effort.

129.   With the backing of Prevent Group, Prevent USA invested in building relationships with U.S. targets beginning in 2014.  Prevent USA engaged investment banks to find potential U.S. targets.  Prevent USA hired an experienced American acquisition advisor to facilitate communication with potential targets and their investment banks.  Prevent USA sought to secure financing commitments to finance the acquisitions.  Prevent USA set up a dedicated office in New York City for the purpose of acquiring targets based in the United States.

130.   Under Prevent USA's American acquisition plan, Prevent USA was prepared to invest as much as $300 million over three years, with other expenditures contemplated after that time.

131.   For each of the potential acquisition targets, Prevent USA hired analysts and consultants to prepare detailed economic analyses with investment banks, assess the terms of a potential deal, and facilitate an acquisition.

132.   For a number of companies that Prevent USA was prepared to acquire, however, it turned out that these efforts would go to waste. At least eight suppliers based in the United States that Prevent USA sought to acquire (the "Target Companies") were also on Volkswagen's List.  These Target Companies were:

> (a)   Tower International, a supplier of metal automotive body structures, headquartered in Livonia, Michigan;

> (b)   Hilite International, a supplier of engine and transmission

components, headquartered in Germany, with its North American Sales and Research and Development Center in Orion, Michigan;

(c)     Camaco-Amvian, a supplier of metal seat structures, headquartered in Farmington Hills, Michigan;

(d)     Dura Automotive Systems, a supplier of control and structural systems, headquartered in Auburn Hills, Michigan;

(e)     Visteon, a supplier of interior electronics, headquartered in Van Buren Charter Township, Michigan;

(f)     Key Plastics, a plastic interior and exterior trim supplier, headquartered in Livonia, Michigan;

(g)     Mahle Industries, Inc., a supplier of air systems and fuel management systems, headquartered in Farmington Hills, Michigan; and

(h)     IAC, a leading global supplier of automotive component parts, including among other things, instrument panels, consoles, door panels, and overhead systems, headquartered in Arlington, Texas.

133.   Each of these Target Companies had an existing relationship with Volkswagen, including selling automotive component parts to Volkswagen in the United States. Each of the Target Companies manufactured and sold automotive component parts in the United States to be incorporated by OEMs, including Volkswagen, in passenger vehicles manufactured and sold in the United States to

United States consumers. Each of the Target Companies is either a Tier 2 or a Tier 3 supplier.

134.   Volkswagen subjected each of the Target Companies to infracompetitive prices and terms, and each was highly financially distressed at the time of Prevent USA's attempted acquisition. Dura Automotive Systems, for example, had recently filed for Chapter 11 Bankruptcy. Visteon had also previously filed for Chapter 11 bankruptcy.

135.   All eight Target Companies appear on Volkswagen's List—that is, the List that Volkswagen used to track suppliers and ensure they were not acquired by Prevent Group.

136.   In the row for Visteon, for example, Volkswagen writes that its reason for inclusion on the List is "showing signs of a possible sale in 2017." Visteon's external economic rating is listed as "CCC," a notation indicating Visteon was highly financially distressed. The "next step" for Volkswagen was to "[p]repare and agree an informational agreement."

137.   Volkswagen deployed a variety of tactics to stop the acquisition of these Target Companies by stronger suppliers, and by Prevent Group in particular. Volkswagen pressured failing suppliers to take Prevent Group and its family of companies, including Prevent USA, off their lists of potential acquirers, threatening that they would otherwise not have a future with Volkswagen as a customer.

Volkswagen also actively pressured M&A advisors. When an advisor would consider Prevent USA as a potential acquirer, Volkswagen intervened to stop the sale. In addition, a sale-side acquisition advisor asked other advisors to exempt Prevent USA representatives from any communication soliciting bids or advertising automotive targets. On information and belief, these sale-side advisors were acting at the direction of Volkswagen. And, as detailed below, Volkswagen also resorted to extracting agreements from the Target Companies that explicitly prevented any sale of their business that might threaten Volkswagen. Through these efforts, Volkswagen deliberately and repeatedly reached into the United States, and into Texas in particular, to perpetrate its anticompetitive scheme.

138. Prevent USA's exclusion from the market for Volkswagen's automotive component parts through the blocking of the acquisition of United States-based suppliers, which both sold parts to Volkswagen in the United States for the inclusion in cars both manufactured and sold in the United States, impacted domestic commerce, and this impact directly caused Prevent USA injury through lost profits.

**D.  Through an Explicit, Written Agreement, Volkswagen Conspires with Tower to Stop an Acquisition by Prevent USA.**

139. One example of Volkswagen's exclusion of Prevent USA from the market for Volkswagen automotive component parts was its conduct related to

Prevent USA's attempts to acquire the Brazilian operations of Michigan-based Tower.

140.   Tower manufactured metal automotive body structures and assemblies, including metal frames, chassis, and suspension components.  In April 2016, Tower publicly announced that it was selling its operations in Brazil and China.  Its net income had dropped by 40% the year before. Tower was struggling.

141.   Volkswagen included Tower on its List. In the "reason for inclusion" column, Volkswagen wrote, "Sale of European and Brazilian business targeted, Tower Brasil, CZ and SK in deficit . . . ." In the status column, Volkswagen noted "[c]onversation with Tower is done" and "[o]bligation to provide information as agreed for Tower Europe." For next steps, Volkswagen wrote, "Clarification Procedure Brazil with Group and VW Brazil, feedback VW Brazil is pending."

142.   On May 19, 2016, a Prevent representative emailed Tower Americas CFO Phil Pfefferle in response to Tower's public announcement of the sale. Almost instantly, however, Pfefferle responded that "Tower can not [*sic*] do a transaction with [Prevent]."  After additional back and forth, Prevent offered to purchase all of Tower's Brazilian operations for 200 million Brazilian Real (about $48.6 million).

143.   It ultimately became clear, however, that Volkswagen was standing in the way of a potential acquisition by Prevent.

144.   On June 22, 2016, Tower's CEO Mark Malcolm ("Malcolm")

responded to Prevent's offer in writing: "Volkswagen is the largest customer of Tower in Aruja [Brazil] and is also Tower's largest customer in Europe, so we cannot risk creating a problem.  If our understanding is correct, ***please ask the head of Purchasing for Volkswagen Brazil to advise us that they would have no issue if Tower Aruja [Brazil] were sold to your company***."  In a follow-up email the next day, Malcolm wrote "[i]f and when you are confident that Volkswagen Purchasing would support a possible acquisition of Tower Aruja [Brazil] by your company, ***please ask Volkswagen Purchasing to so advise Tower*** Brazil's President."

145.   Eventually, the full story came out.  In a conversation with a third-party advisor in 2019, the Tower Americas CFO, Phil Pfefferle, admitted that in negotiations with Volkswagen, "***I had to agree in writing [with Volkswagen] that [Tower] would not sell to a Prevent associated company***."

146.   The purpose and effect of the agreement between Volkswagen and Tower was to foreclose any potential acquisition by Prevent of Tower's operations, which included operations in the United States, and operations that produced and sold automotive component parts in the United States for vehicles sold in the United States.

**E.    Volkswagen Continues to Preclude Prevent USA From Entering the U.S. Market for Volkswagen Automotive Component Parts By Blocking the Acquisition of IAC.**

147.   In an effort to continue developing its U.S. presence and the attractive

proximity to the Mexican automotive industry, Prevent USA set its sights on pursuing potential acquisitions and investments in Texas. To strengthen their bargaining position as they set their sights on new acquisitions, Prevent USA also hired a Texas-based Chief Executive Officer with experience in the automotive industry to explore and identify additional investment opportunities in the area. As with their earlier acquisitions, Prevent USA focused on distressed suppliers. Again, Prevent USA engaged investment banks to assist with identifying potential U.S. targets and hired an American advisor to facilitate communication with potential targets and their investment banks.

148.   One of the target acquisitions identified by Prevent USA's banker was IAC,[7] a global automotive component part supplier headquartered in Luxembourg, with operations in Arlington, Texas. IAC was near bankrupt and presented the ideal opportunity for Prevent USA to invest their extensive experience and resources. Prevent USA's banker met with the owner of IAC to discuss the possibility of an acquisition on a no-name basis, and the owner of IAC agreed to meet with a representative of the would-be acquirer to discuss an offer for the acquisition of IAC. In August 2022, the owner of IAC and Prevent USA's advisor discussed the potential acquisition and negotiations went well. The owner of IAC indicated that they would

---

[7] IAC works on multiple lines with Volkswagen and is one of the largest injection molders with a focus on interior and exterior automotive component parts.

speak to the management team of IAC to grant Prevent USA access to their data room. The owner of IAC agreed that the next step for Prevent USA after accessing IAC's data room would be for Prevent USA's advisor to send a Letter of Intent ("LOI") outlining the agreement and commitment to go forward with the acquisition. At the end of this discussion, Prevent USA's advisor disclosed for the first time that he represented Prevent USA, Prevent Group, and its affiliates. The owner of IAC agreed to discuss the acquirer's identity with his management and shared that he did not foresee any issues with the acquisition going forward. Despite promising negotiations, almost immediately after IAC learned of the would-be acquirer's identity as Prevent USA, the lines of communication between IAC and Prevent USA went cold.

149.   On information and belief, IAC's distressed status and failure to sell its U.S. operations to Prevent USA significantly decreased the company's value. Prevent USA's acquisition would have maximized value by revamping the U.S. operations. This has left IAC small, weak, and subject to Volkswagen's market power. On information and belief, Volkswagen forced IAC to stop negotiating with Prevent USA.

## F.   It is Plausible to Infer that Volkswagen Executed Similar Agreements with Other Target Companies based in the United States.

150.   Based on the facts alleged in this Complaint and summarized below, it

is plausible to infer that Volkswagen entered into similar agreements with the other Target Companies and other suppliers.

151.  *First*, Volkswagen's conduct with respect to Grammer, Groclin, Tower, the Target Companies, and IAC demonstrates a pattern to block acquisitions that Volkswagen perceived as posing a procompetitive threat, including through express, written agreements. Both the written Groclin agreement and the written Grammer agreement came shortly after Prevent Group expressed an interest in acquiring those companies. Volkswagen acknowledged in its List that it entered into the agreements with Grammer and Groclin with the express purpose of blocking Prevent Group's acquisition attempt.

152.  *Second*, each of the Target Companies appears on Volkswagen's List, which it used to track weak, highly dependent suppliers, and to block Prevent Group's acquisition attempts of those suppliers.

153.  *Third*, Prevent USA expressed interest in acquiring each of the Target Companies, including securing financing for the potential acquisitions and hiring investment banks to evaluate the acquisitions. Each of the Target Companies were distressed or underperforming at the time of the attempted acquisition, and each had a prior relationship with Volkswagen. The Target Companies therefore fit the profile of "increased risk" acquisition targets with a "high dependency" on Volkswagen, as outlined in Volkswagen's Project 1 presentations.

154.  *Fourth*, Volkswagen's Project 1 outlined a deliberate strategy to exclude Prevent Group from the market and stop Prevent Group from "continu[ing] to exert pressure on Volkswagen through further takeovers." Volkswagen also explicitly outlined its plan to use "pre-purchase option contracts to gain visibility into potential sales," which would include "change of control clauses" designed to stop acquisitions of suppliers such as the Target Companies that were small to mid-size suppliers with high dependency on Volkswagen.

155.  *Fifth*, Volkswagen actively pressured M&A advisors, including Morgan Stanley in the case of Grammer, not to contact or solicit bids from Prevent Group for failing automotive companies.

156.  *Sixth*, Volkswagen actively pressured distressed suppliers not to sell their companies to Prevent Group, threatening to stop doing business with the suppliers if they allowed Prevent Group's acquisition.

157.  Together, this conduct makes it plausible to infer that Volkswagen engaged in the same or similar anticompetitive conduct to stop Prevent Group's affiliate, Prevent USA, from acquiring each of the Target Companies, as well as others.

## ANTICOMPETITIVE HARM

158.  The harm to competition in this case is straightforward.  As explained in a leading antitrust treatise: "The standing of a directly foreclosed supplier is

usually clear—such as when the plaintiff's potential customers agree to patronize only a rival supplier.  Such a restraint is illegal, if at all, because it forecloses so much patronage from rival suppliers as to weaken competition in the supplying market. This rationale explicitly covers the injury suffered by the plaintiff." Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law:  An Analysis of Antitrust Principles and Their Application* ¶ 350e (4th ed. 2013–18).

159.   Here, Defendants' agreements directly foreclosed Plaintiff's ability to compete in the market for Volkswagen automotive component parts by cutting off Plaintiff's access to that entire market. As a result of Defendants' misconduct, Prevent was excluded from the market and blocked from conducting the acquisition strategy necessary to expand its business. In this "grow or die" industry, the effect on the Prevent Group, including Plaintiff, was disastrous: Prevent Group's automotive business went from being worth over €1 billion (about $1.13 billion) to having serious liquidity problems that threaten its long-term viability.

160.   As demonstrated by the substantial resources that Prevent Group, including Prevent USA, devoted to its acquisition strategy, in the absence of Volkswagen's interference and anticompetitive agreements with the Target Companies, Prevent Group would have acquired some or all of the Target Companies, or divisions of the Target Companies. Each of the thwarted acquisitions would have increased productive efficiencies by allowing Prevent Group to

capitalize on economies of scale and scope. The acquisitions would have increased the output in each of the relevant product sub-markets by allowing Prevent Group, and Prevent USA, to resist Volkswagen's infracompetitive price and supply terms. In turn, the acquisitions would have allowed each of the Target Companies to remain financially viable competitors in their respective product sub-markets.

161. All of the Target Companies manufacture and sell automotive component parts in the United States for incorporation in Volkswagen vehicles manufactured and sold in the United States. Volkswagen Group of America, under the direction of Volkswagen AG, purchased automotive component parts from the Target Companies and Prevent Group at artificially low prices. Further, on information and belief, through Volkswagen Group of America, Volkswagen AG sold passenger vehicles in the United States that incorporated the affected automotive component parts. Accordingly, by artificially restraining competition in the automotive component part market, and artificially reducing the output and product quality in that market, Volkswagen's anticompetitive actions had a direct, substantial, and reasonably foreseeable effect on United States commerce. This impact harmed Prevent USA by depriving it of the profits it would have earned had it not been excluded from the market.

162. Acquiring suppliers is necessary to maintain the bargaining power, geographic scope, and economies of scale required to remain in the Volkswagen

automotive component part market. Across industries, the top procurement tactic generating business value is consolidating volumes to increase negotiating powers. This is because fewer suppliers with more volume means shared investment in technology, capacity, and personnel are all possible areas for cost savings.

163.   But for the collusion between Volkswagen and the Target Companies, and Volkswagen's tortious interference with those business expectancies, Prevent Group, including Prevent USA, would have increased efficiency and thus profitability across its business. Prevent USA's acquisitions of the Target Companies thus would have had a procompetitive effect in each of the relevant product markets because:

a)      The products produced by Prevent Group, Prevent USA, and the Target Companies are highly synergistic, allowing Prevent Group and Prevent USA to attain lower per-unit costs and greater specialization of both labor and machinery;

b)      The distribution channels of Prevent Group, Prevent USA, and the Target Companies were highly similar, which would have facilitated economies of scale in distribution because downstream suppliers could more cheaply distribute the goods once bought separately from Prevent and the Target Companies;

c)      Each of the Target Companies was distressed, underperforming,

or had significant room for operational improvement, and Prevent USA's acquisition would have allowed the Target Companies' usable assets to remain productive, reassigning the productive assets from failing users to a successful user;

d)    Prevent USA's acquisition of the Target Companies would have precluded the administrative costs of bankruptcies; and

e)    Prevent Group and Prevent USA would have been able to realize research and development efficiencies because of both the diversity of its activities post-acquisition and its internal organization.

164.    When a competitor is foreclosed from a market—particularly where, as here, Volkswagen admits that Prevent Group was the most cost efficient competitor in that market—the result is a substantial reduction in market output.

165.    Volkswagen's tortious and anticompetitive conduct has also caused Prevent USA to suffer substantial monetary damages. Prevent USA made a series of internal projections based on the deployment of the $300 million in capital that Prevent USA had allocated toward its acquisition strategy. Upon the successful deployment of that capital through acquisition of the Target Companies, Prevent USA projected a return of between $750 million and $1 billion over five to seven years.

166.    This conservative projection range was calculated using Prevent

Group's past returns from acquired suppliers, Prevent USA management's projections for the returns from acquiring the Target Companies, and projections on the increased efficiencies, including economies of scale and scope, that Prevent USA would have achieved by adding one or more of the Target Companies to the Prevent portfolio.

167.   By blocking Prevent USA from acquiring the Target Companies, Volkswagen foreclosed Prevent USA from capturing these returns, caused loss to Prevent USA's industry goodwill and market reputation, and substantially decreased the overall valuation of Prevent USA.

168.   Consequently, Prevent USA is suffering and will continue to suffer significant economic damages. In addition, Defendants' violations of the antitrust laws have and will continue to foreclose Prevent USA and others like it from the supplier market for automotive component parts for Volkswagen vehicles, providing Volkswagen with monopsony power in the relevant market, or serving to extend and solidify Volkswagen's existing monopsony in the relevant market.

## HARM SUFFERED BY PLAINTIFF FROM DEFENDANTS' MISCONDUCT

169.   Facing an enormous loss in revenue from the loss of contracts with the automotive component part suppliers, Prevent USA's business has suffered dramatically.

170.   At present value, Plaintiff's damages based on those lost profits will be

proven at trial, but is currently estimated to be in excess of $750 million.  This estimate is based on lost profits using revenues from the Volkswagen suppliers projected out seven years, which is a typical contracting period.

171.   In addition to lost business from the Volkswagen suppliers, the dramatic decrease in production also caused Prevent USA to be unable to maintain the scale necessary to offer low prices in the Volkswagen automotive component market.

172.   By foreclosing Prevent USA from capturing these returns, Defendants caused loss to Prevent USA's industry goodwill and market reputation, and substantially decreased the overall valuation of the Prevent Group and Prevent USA.

## LEGAL CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Violation Of Sherman Act § 1, Agreement In
Restraint Of Trade Against All Defendants)**

173.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

174.   As alleged, Defendants have engaged and participated in one or more contracts, combinations, or conspiracies to artificially restrict competition for automotive component parts.  Volkswagen expressly agreed with each of the Target Companies not to purchase products from Prevent USA for its automotive component parts or those of its subsidiary companies such as Audi, Bentley, and Porsche. Volkswagen also expressly agreed with numerous suppliers, including each

of the Target Companies, not to allow Prevent USA to acquire their companies.

175. Defendants' conduct violated, and continues to violate, Section 1 of the Sherman Act, 15 U.S.C. § 1, as an unreasonable restraint of trade.

176. Defendants' conduct is an unreasonable restraint of trade under the rule of reason.

177. The relevant market is the worldwide market for Volkswagen automotive component parts.

178. Defendants have committed at least one overt act in furtherance of the conspiracy alleged in this Complaint.

179. Defendants' actions as part of, and in furtherance of, their contracts, combinations, or conspiracies in restraint of trade were authorized, ordered, or done by one or more of Defendants' officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

180. Defendants' anticompetitive acts had, and continue to have, substantial, unreasonable, and foreseeable effects on interstate commerce in the automotive component part market, including in each of the relevant product sub-markets. These anticompetitive effects include:

(a) Artificial suppression of competition in the market for Volkswagen automotive component parts;

(b) Artificial reduction in market output for Volkswagen automotive

component parts; and

(c)     Artificial reduction in innovation and quality in the Volkswagen automotive component parts market.

181.   Any competitive benefits from Defendants' conduct do not outweigh the actual and likely anticompetitive effects of the agreements.  Any possible procompetitive benefits of the agreements between Defendants could have been achieved by less restrictive alternatives.

182.   Plaintiff was harmed, and continues to be harmed, as a result of Defendants' anticompetitive conduct.  Plaintiff suffered antitrust injury through:

(a)     Substantial foreclosure from the market for Volkswagen automotive component parts;

(b)     Artificial suppression of competition in the market for Volkswagen automotive component parts;

(c)     Artificial reduction in market output for Volkswagen automotive component parts;

(d)     Artificial reduction in innovation and quality in Volkswagen automotive component parts; and

(e)     Decreased productive efficiency through loss of economies of scale and scope.

183.   The injury to Plaintiff was a foreseeable consequence of Defendants'

anticompetitive agreements.

## SECOND CLAIM FOR RELIEF
### (Violation Of Sherman Act § 2, Monopsonization Against Defendants)

184.  Plaintiff incorporates by reference the allegations in all preceding paragraphs.

185.  The relevant market is the worldwide market for Volkswagen automotive component parts.

186.  Defendants have market power and monopsony power in the Volkswagen automotive component part market.

187.  Defendants' market power is not the consequence of a superior product, business acumen, or historical accident.  Instead, Defendants' market power stems from their anticompetitive conduct, including their anticompetitive agreements to foreclose Plaintiff from the Volkswagen automotive component part market, which unreasonably restrains trade by diminishing Plaintiff's bargaining power in that market. Defendants therefore willfully acquired or maintained their market power.

188.  There is no procompetitive justification for Defendants' anticompetitive conduct that outweighs the anticompetitive effects.  Any possible procompetitive benefits could have been achieved by less restrictive alternatives.

189.  Defendants' willful acquisition or maintenance of its market described in this Complaint injured, and continues to injure, Plaintiff in its business or property.  Plaintiff suffered antitrust injury through:

(a)   Substantial foreclosure from the Volkswagen automotive component parts market;

(b)   Artificial suppression of competition in the market for Volkswagen automotive component parts;

(c)   Artificial reduction in market output for Volkswagen automotive component parts;

(d)   Artificial reduction in innovation and quality in Volkswagen automotive component part market; and

(e)   Decreased productive efficiency through loss of economies of scale and scope.

190.   The injury to Plaintiff was a foreseeable consequence of Defendants' willful maintenance or acquisition of their market power.

## THIRD CLAIM FOR RELIEF
### (Tortious Interference With Business Relationship And/Or Expectancy Against Defendants)

191.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

192.   There was a reasonable probability that Plaintiff would have entered into a business relationship with the other Volkswagen suppliers for the sale of Volkswagen automotive component parts. There was also a reasonable probability that Plaintiff would have entered into a business relationship with the Target

Companies. Plaintiff had more than a subjective belief that it would complete these contracts because it was a supplier in the competitive bidding process with Volkswagen suppliers and was a price-leader in the products the Target Companies specialized in.

193.    Volkswagen knew about the relationships or expectancies between Plaintiff and Volkswagen suppliers because Volkswagen explicitly entered into an agreement with Volkswagen suppliers not to purchase products from Plaintiff.

194.    Volkswagen intentionally interfered in the relationship or expectancy between Plaintiff and Volkswagen suppliers. Volkswagen had a conscious desire to prevent the relationship from occurring. Volkswagen's interference was the proximate cause of Plaintiff's injury, as but for Volkswagen's interference, Volkswagen suppliers, specifically, the Target Companies, would have contracted with Plaintiff for the sale of Volkswagen automotive component parts.

195.    Volkswagen's conduct satisfies the independently unlawful act requirement because:

(a)    Volkswagen's conduct is anticompetitive, violating federal and state antitrust law;

(b)    Volkswagen's conduct amounts to the Texas tort of civil conspiracy; and

(c)    Volkswagen acted with malice and without a valid business

justification because the interference served no legitimate business or economic purpose.

196.   Volkswagen was not motivated by legitimate business reasons. Volkswagen does not have a legitimate business justification for its interference.

197.   Volkswagen's interference was the direct and proximate cause of Plaintiff's inability to bid on Volkswagen supplier contracts and ultimately obtain those contracts.

198.   As a direct and proximate result of Volkswagen's conduct, Plaintiff suffered damages.

### FOURTH CLAIM FOR RELIEF
### (Civil Conspiracy Against Defendants)

199.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

200.   Defendants and the Volkswagen suppliers conspired, through concerted action, to accomplish an unlawful purpose.

201.   The purpose of this conspiracy was unlawful because:

(a)   The agreements were an unlawful restraint of trade in violation of state and federal antitrust law; and

(b)   Defendants' conduct amounts to tortious interference with a business expectancy in violation of state law.

202.   Defendants and Volkswagen suppliers acted together under a common

plan or design.

203.   As a direct and proximate result of the conspiracy, Plaintiff was injured and suffered damages.

## FIFTH CLAIM FOR RELIEF
**(Violation of Texas Antitrust Law, Tex. Bus. & Com. Code Ann. § 15.05, Agreement in Restraint of Trade Against Defendants)**

204.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

205.   The actions and conduct of Defendants as set out above violate Section 15.05(a) of the Texas Business and Commerce Code, and constitute an illegal, improper, and unlawful restraint of trade.

206.   As alleged, Defendants have engaged and participated in one or more contracts, combinations, or conspiracies to artificially restrict competition for Volkswagen automotive component parts. Volkswagen expressly agreed with each of the Volkswagen suppliers not to purchase products from Plaintiff across all OEMs. Volkswagen also expressly agreed with numerous suppliers, including each of the Target Companies, that they would not be purchased by Prevent.

207.   Defendants' conduct is an unreasonable restraint of trade under the rule of reason.

208.   The relevant market is the worldwide market for Volkswagen automotive component parts.

209.   Defendants have committed at least one overt act in furtherance of the conspiracy alleged in this Complaint.

210.   Defendants' actions as part of, and in furtherance of, its contracts, combinations, or conspiracies in restraint of trade were authorized, ordered, or done by one or more of Defendants' officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

211.   Defendants' anticompetitive acts had, and continue to have, substantial, unreasonable, and foreseeable effects on interstate commerce in the Volkswagen automotive component part market, including in each of the relevant product sub-markets.  These anticompetitive effects include:

(a)   Substantial foreclosure from the market for Volkswagen automotive component parts;

(b)   Artificial suppression of competition in the market for Volkswagen automotive component parts;

(c)   Artificial reduction in market output for Volkswagen automotive component parts;

(d)   Artificial reduction in innovation and quality in the Volkswagen automotive component part market; and

(e)   Decreased productive efficiency through loss of economies of scale and scope.

212.   Any competitive benefits from Defendants' conduct do not outweigh the actual and likely anticompetitive effects of the agreements.  Any possible procompetitive benefits of the agreements could have been achieved by less restrictive alternatives.

213.   Plaintiff was harmed, and continues to be harmed, as a result of Defendants' anticompetitive conduct.  Plaintiff suffered antitrust injury through:

(a)   Substantial foreclosure from the market for Volkswagen automotive component parts;

(b)   Artificial suppression of competition in the market for Volkswagen automotive component parts;

(c)   Artificial reduction in market output for Volkswagen automotive component parts;

(d)   Artificial reduction in innovation and quality in the Volkswagen automotive component part market; and

(e)   Decreased productive efficiency through loss of economies of scale and scope.

214.   The injury to Plaintiff was a foreseeable consequence of Defendants' anticompetitive agreements.

215.   The action and conduct on the part of the Defendants was flagrant and willful, and was for the specific purpose of harming Plaintiff and illegally and

improperly taking Plaintiff's business and diverting it to Volkswagen suppliers. This action and conduct on the part of the Defendants greatly damaged Plaintiff. Thus, pursuant to Section 15.21(a)(1) of the Texas Business and Commerce Code, Plaintiff is entitled to recover three times its actual damages and its reasonable attorney's fees.

### SIXTH CLAIM FOR RELIEF
### (Violation of Texas Antitrust Law, Tex. Bus. & Com. Code Ann. § 15.05, Monopsonization Against Defendants)

216.   Plaintiff incorporates by reference the allegations in all preceding paragraphs.

217.   The action and conduct of Defendants as set out above violated Section 15.05(b) of the Texas Business and Commerce Code, which prohibits monopolization of any part of trade or commerce.

218.   The relevant market is the worldwide market for Volkswagen automotive component parts.

219.   Defendants each have market power and monopsony power in the Volkswagen automotive component part market.

220.   Defendants' market power is not the consequence of a superior product, business acumen, or historical accident.  Instead, Defendants' market power stems from their anticompetitive agreements, including their anticompetitive foreclosure of Plaintiff from the Volkswagen automotive component part market, which

unreasonably restrains trade by diminishing Plaintiff's bargaining power in that market. Defendants therefore willfully acquired or maintained their market power.

221. There is no procompetitive justification for Defendants' anticompetitive conduct that outweighs the anticompetitive effects. Any possible procompetitive benefits could have been achieved by less restrictive alternatives.

222. Defendants' willful acquisition or maintenance of market power described in this Complaint injured, and continues to injure, Plaintiff in its business or property. Plaintiff suffered antitrust injury through:

(a)   Substantial foreclosure from the market for Volkswagen automotive component parts;

(b)   Artificial suppression of competition in the market for Volkswagen automotive component parts;

(c)   Artificial reduction in market output for Volkswagen automotive component parts;

(d)   Artificial reduction in innovation and quality in the Volkswagen automotive component part market; and

(e)   Decreased productive efficiency through loss of economies of scale and scope.

223. The injury to Plaintiff was a foreseeable consequence of Defendants' willful maintenance or acquisition of their market power.

224.   Defendants' actions, as set forth above, were willful or flagrant. Therefore, Plaintiff seeks treble damages under Section 15.21(a)(1) of the Texas Business and Commerce Code.

## REQUEST FOR RELIEF

225.   Plaintiff requests the following relief:

(a)   A jury verdict for the compensatory damages sustained by Plaintiff, in an amount to be determined at trial, but currently estimated to be in excess of $750 million;

(b)   A judgment against Defendants, by the Court, in treble the amount of the jury verdict, and for attorneys' fees, costs, and interest under Section 15 of the Clayton Act, 15 U.S.C. § 15;

(c)   A permanent injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants from future violations of the antitrust laws and from practices that facilitate those violations;

(d)   Restitution and disgorgement; and

(e)   Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 4, 2023       Respectfully submitted,

**MCKOOL SMITH P.C.**

/S/ Sam Baxter
Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@McKoolSmith.com
Jennifer Truelove
Texas State Bar No. 24012906
jtruelove@McKoolSmith.com
**MCKOOL SMITH P.C.**
104 E Houston Street, Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Radu A. Lelutiu
James H. Smith
Melissa Cabrera
**MCKOOL SMITH P.C.**
One Manhattan West, 50th Floor
New York, NY 10001
(212) 402-9400
rlelutiu@mckoolsmith.com
jsmith@mckoolsmith.com
mcabrera@mckoolsmith.com

*Attorneys for Plaintiff*
**PREVENT U.S.A. CORPORATION**